UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - :
PEDRO ROSARIO,                              : 07 Civ. 3611 (WHP)(JCF)
                                            :
                      Petitioner,           :     REPORT AND
                                            :     RECOMMENDATION
     - against -                            :
                                            :
JOSEPH T. SMITH, Superintendent,            :
Shawangunk Correctional Facility,           :
                                            :
                      Respondent.           :
- - - - - - - - - - - - - - - - - - - - - :

TO THE HONORABLE WILLIAM H. PAULEY, U.S.D.J.:

        Pedro Rosario brings this petition for a writ of habeas corpus
pursuant to 28 U.S.C. § 2254, challenging his conviction in New
York State Supreme Court, Bronx County, for three counts of murder
in the second degree, conspiracy in the second degree, and criminal
possession of a weapon in the second degree.   Mr. Rosario
challenges his conviction on grounds that (1) he was denied due
process because the prosecution intimidated a witness, preventing
him from testifying at trial, (2) the prosecution withheld
exculpatory evidence in violation of the principles set fourth in
Brady v. Maryland, 373 U.S. 83 (1963), and (3) trial counsel failed
to provide effective assistance.   For the reasons set forth below,
I recommend that the petition be denied.

Background

    A. The Crime

    On May 18, 1992, the bodies of Otis Lamont Blair, Damien
Salgado, and Daniel Santiago were discovered in apartment 4S at 350

1

St. Ann's Avenue in the Bronx.  (Tr. at 369).[1]   Mr. Blair had sustained four gunshot wounds, three directly to his head (Tr. at 434-35), Mr. Santiago had been shot directly through the right side of his head (Tr. at 433), and Mr. Salgado had received four gunshots, two of which passed through his head and face.  (Tr. at 427-30).  The police estimated the homicides had occurred sometime between 10:30 and 11:00 p.m. that evening.  (Tr. at 315).

      During 1992, Mr. Rosario, also known as "Junego," controlled "Orange Top Crack," a narcotics operation that distributed crack-cocaine in the Bronx on 140th Street between Brook and Willis Avenues.  (Tr. at 399-400).  To conduct this activity, Mr. Rosario employed a number of individuals in and around the Bronx: Gary Crespo served as his "right-hand man," Milton Harris and Cory Jackson acted as managers, and Josh Pringle actually sold the drugs on the street.  (Tr. at 143-44).  In addition, Mr. Rosario had employed two of the shooting victims, Mr. Salgado and Mr. Blair, who had used the St. Ann's Avenue apartment to package the narcotics for sale.  (Tr. at 401-02, 442).

      On the afternoon of May 18th at approximately 4:30 p.m., Mr. Rosario summoned Gary Crespo, Cory Jackson, Milton Harris, and Josh Pringle into a stairwell at 140th Street and Willis Avenue. (Tr. at 141-43).  At this meeting, Mr. Rosario accused Otis Blair and another individual nicknamed Buddha of stealing from him, and he

---

[1] "Tr." refers to the transcript of the petitioner's trial.

offered to pay $2,500 apiece for their murders. (Tr. at 144). Cory Jackson accepted this contract, and Mr. Crespo provided him with a silver nine-millimeter Taurus pistol in order to carry out the murders. (Tr. at 147).

Later that evening Mr. Harris and Mr. Jackson went to 350 St. Ann's Avenue, the location of the homicides. (Tr. at 156-57). They were accompanied by Nicholas Taylor, a 13-year-old boy who worked for Mr. Jackson. (Tr. at 157-58, 227). The three made their way to the fourth floor where Mr. Jackson instructed Mr. Harris and Mr. Taylor to wait for him on the landing as he proceeded toward apartment 4-S. (Tr. at 158-59). Soon after, Mr. Harris heard a gunshot, then saw Mr. Jackson return and heard more gunshots ring out. (Tr. at 160). The three then left the building. (Tr. at 160). The police discovered the bodies of the victims at approximately 11:00 p.m. that same evening. (Tr. at 362-65).

During the police investigation, Detective James Slattery, the officer assigned to the homicides, learned that Mr. Harris had been seen running from 350 St. Ann's Avenue the night of the shooting. (Tr. at 317). On May 20, the police picked up Milton Harris and Nicholas Taylor and brought them to the 40th precinct in the Bronx. (Tr. at 177-78, 321). Both were questioned about the night of the murders and both gave statements to Detective Slattery and to an assistant district attorney named Tony Castro. (Tr. at 321). Ultimately, Mr. Rosario, Mr. Jackson, and Mr. Crespo were arrested and charged as co-conspirators in the commission of the three

3

homicides.  (Tr. at 308).

    B. <u>The Brady Hearing</u>

    Prior to Mr. Rosario's trial, a <u>Brady</u> hearing was conducted concerning the prosecution's late disclosure to the defense of Mr. Taylor's two statements to the police.[2]  Although the prosecution had interrogated Mr. Taylor two days after the homicides, they did not turn over these statements until September 6, 1995, six weeks before trial and approximately three years after the police had interviewed him.  (H. at 138-41, 464, 509-10).[3]  These statements were potentially adverse to the prosecution's case because they contradicted certain details of the testimony of their main witness, Milton Harris.

    On September 18, 1995, Mr. Taylor appeared at the <u>Brady</u> hearing.  He testified that because he suffered from a  mental disability he had "trouble comprehending and understanding things from time to time."  (H. at 433).  He also stated that he could no longer remember any of the details of the night of the shooting, because it had "been so long."  (H. 438-39, 449-51).  Mr. Taylor was able to recall being questioned by police officers but could not remember the substance of his answers.  (H. at 347, 438).  As

---

[2] <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), stands for the principle that, in a criminal case, the prosecution has a duty under the Fourteenth Amendment to reveal any material favorable to the defendant.

[3] "H." refers to the transcript of a suppression hearing conducted prior to the petitioner's trial.

a result, Mr. Taylor was never called to testify at trial.

After the Brady hearing, the court found that the prosecution had violated its disclosure obligations, holding that "the danger that Taylor's memory would degenerate at a high rate combined with the prosecution [sic] failure to turn over the statements in a timely way has led to prejudice of the defendants which requires a sanction." People v. Jackson, 168 Misc.2d 182, 190, 637 N.Y.S.2d 158, 164 (N.Y. Sup. Ct. 1995). As a remedial measure, the judge permitted the admission of Taylor's two statements, which otherwise would have been largely inadmissable, together with an adverse inference charge against the prosecution. Id. at 191, 637 N.Y.S.2d at 164.

Mr. Rosario, Mr. Jackson, and Mr. Crespo were co-defendants throughout the pre-trial suppression proceedings. Their cases, however, were severed prior to trial.

C. Trial

Mr. Rosario was charged with three counts of murder in the second degree (N.Y. Penal Law § 125.25), one count of conspiracy in the second degree (N.Y. Penal Law § 105.15), and criminal possession of a weapon in the second degree (N.Y. Penal Law § 265.03). The prosecution argued that the petitioner had discovered that Otis Blair and Buddha had been stealing from his operation, and he had therefore solicited their murder in return for money. (Tr. at 687-90). Mr. Jackson accepted the offer, went to 350 St. Ann's Avenue to kill Otis Blair, and murdered Damien Salgado and

Daniel Santiago because they were in the apartment at the time. (Tr. at 707).

Milton Harris provided the prosecution's most damaging testimony. In his first appearance on the stand, Mr. Harris claimed to have forgotten the shooting and the events that led up to it. (Tr. at 113-15). This was a substantial deviation from earlier statements that he had provided. (Tr. at 114-20). As a result, the court granted the prosecution's motion to place Mr. Harris in custody as a material witness in order to compel his testimony. (Tr. at 120-21). When he returned to the stand the next day, the trial judge permitted the prosecution to question him about the circumstances of his memory loss. (Tr. 133-40). Mr. Harris testified that he had feigned his memory loss because he had been threatened by Mr. Rosario months before the trial. (Tr. at 141-42).

Mr. Harris then testified that he had been present on the afternoon of May 18th at 140th Street and Willis Avenue when Mr. Rosario had offered a reward for the murders of Otis Blair and Buddha. (Tr. at 141-47). Mr. Harris stated that Gary Crespo, Cory Jackson, and Josh Pringle had also been present at this meeting. (Tr. at 143). According to Mr. Harris, Mr. Jackson had responded, "Whoever do this is going to get paid," after which Mr. Rosario instructed Mr. Crespo to provide Mr. Jackson with a nine-millimeter Taurus pistol. (Tr. at 146-47). Mr. Harris also identified the silver nine-millimeter, which the prosecution had

recovered and matched to the shootings, as the same gun that Mr. Rosario had provided to Mr. Jackson during the meeting. (Tr. at 149). According to Mr. Harris, Mr. Rosario had provided Mr. Jackson with the gun because it had been used in a previous shooting. (Tr. at 147). Mr. Harris was familiar with the weapon because he had been present when Mr. Rosario had first purchased it for his narcotics operation. (Tr. at 150).

Later that evening, Mr. Harris, accompanied by Cory Jackson and Nicholas Taylor, went to 350 St. Ann's Avenue to drop off profits from the narcotics operation. (Tr. at 156-57).[4] Mr. Harris testified that after Mr. Jackson proceeded toward the apartment and out of his line of sight, he heard a gun go off. (Tr. at 160). Mr. Jackson returned, and Mr. Harris heard several more gun shots as well as loud music. (Tr. at 160). Later that night, Mr. Jackson told Mr. Harris that he had been paid, presumably for committing the murder as instructed by Mr. Rosario. (Tr. at 161).

The prosecution presented several other witnesses whose testimony supported Mr. Harris' version of the events. Sharon Salgado, Damian Salgado's sister, testified that both Damian and Otis had worked as "bottlers" for Mr. Rosario and had been stealing narcotics from him. (Tr. at 442). Nathan Jordan, Cory Jackson's cousin, testified that Mr. Jackson had given him the nine-

---

[4] Mr. Harris also testified to the presence of another unidentified person present on the fourth floor the night of the shooting. This person was referred to as "Flat Top" because of the style of his hair. (Tr. at 234-35).

7

millimeter Taurus some time after the shootings and that he had led the police to the gun during the investigation. (Tr. at 465-67). In addition, the prosecution presented ballistics evidence that linked that same gun to bullets taken from the body of Otis Blair and shell casings found at the scene of the shooting. (Tr. at 387-94). The trial judge also admitted ballistics proof that the gun matched casings recovered from a previous shooting, evidence that tended to support Mr. Harris' testimony that Mr. Rosario had provided the gun because it had been used before. (Tr. at 258, 385-89).

The defense case consisted principally of undermining Mr. Harris' credibility since his testimony was the prosecution's only direct evidence linking Mr. Rosario to the homicides. Through a rigorous cross-examination as well as the introduction of Nicholas Taylor's two statements to the police, the defense argued that Mr. Harris had been an accomplice to the crimes and that his testimony was therefore self-serving and unreliable. (Tr. at 662-64).

During cross-examination, Mr. Harris revealed that he had originally been detained by the police as a suspect in the crime. (Tr. at 174-75). In the course of his interrogation, Detective Slattery had threatened to "pin the crime" on him and told him he was facing a life sentence. (Tr. at 178). In addition, Mr. Harris admitted that as a member of Mr. Rosario's organization he had had access to the gun that was used in the shootings and had in fact possessed it for drug-related activities. (Tr. at 200).

The defense also pointed out numerous discrepancies between Milton Harris' testimony and statements he had made earlier to the police, to the grand jury, and to investigators the defense had hired to prepare for trial. According to the defense, Mr. Harris had altered his narrative of the events in order to reconcile a number of implausible inconsistences. (Tr. at 667-69). For example, during the police investigation, Mr. Harris had originally stated that the meeting in which the conspiracy was hatched had occurred between 11:30 a.m. and 12:00 noon. (Tr. at 190-91). On the stand, however, Mr. Harris testified that the meeting occurred at approximately 4:30 p.m. (Tr. at 112). Because Mr. Harris' shifts with the narcotics organization were from 4:00 p.m. to 12:00 a.m. (Tr. at 110-11), it would have been unlikely for him to be present at 140th Street and Willis Avenue at 11:30 a.m. as he had originally told the police. The defense argued that Mr. Harris changed his testimony regarding the time of the meeting to reconcile this inconsistency. (Tr. at 668).

In addition, Mr. Harris' statements to the police and his trial testimony differed as to the individuals present the night of the shooting. During the police interrogation, Mr. Harris had stated that Gary Crespo had been present on the fourth floor the evening of the shooting and had left with Buddha to get some food. (Tr. at 237-38). This was at odds with Mr. Harris' testimony at trial that Mr. Crespo, as Mr. Rosario's "right hand man," had been complicit in a conspiracy to murder Buddha. (Tr. at 143-44). On

the stand, Mr. Harris no longer mentioned that Mr. Crespo was present and testified that only he, Cory Jackson, Nicholas Taylor, and a man nicknamed Flat Top were on the fourth floor on the night of the shooting.  (Tr. at 143, 235).  The defense argued that this shift further undermined Mr. Harris' credibility.

The defense also introduced Nicholas Taylor's two statements to the police, which further contradicted aspects of Mr. Harris's testimony.  (Tr. at 560-90).  During his direct examination, Mr. Harris had testified that he saw Mr. Jackson walking toward the apartment and that he then heard gun shots ring out.  (Tr. at 160). In Mr. Taylor's statement, however, Mr. Jackson exited the apartment first, headed down the stairs, and then the gun shots rang out.  (Tr. at 581).  In addition, while Mr. Harris had testified that he had heard two sets of shots, one directly after Mr. Jackson set off toward the apartment and one set after Mr. Jackson had returned (Tr. at 159), Mr. Taylor heard only one set of shots, and only after Mr. Jackson had already left the apartment and descended the stairs. (Tr. at 578-79, 581).  Mr. Taylor had also indicated to the police that he did not see Mr. Jackson with a gun at all that night and instead had observed a silver automatic pistol in Flat Top's waistband.  (Tr. at 563, 579-80).  After Mr. Taylor's statements had been read, the judge issued the following instruction:

> Members of the jury to explain those statements or why they were read to you the People are under obligation to provide the defendant with evidence which may aid the

10

> defendant that detailed statement may aid the defense,
> that these statements were not turned over for almost
> three and a half years, that the jury may but is not
> required to draw adverse inference against the People for
> failing to comply with the decision called People against
> Brady.

(Tr. at 590-91).

The defense also sought to call Josh Pringle, another one of Mr. Rosario's associates, to the stand. Mr. Harris had testified that Mr. Pringle had been present the afternoon of May 18, when Mr. Rosario had solicited the murder of Mr. Blair and Buddha. (Tr. at 143). According to defense counsel, discussions with Mr. Pringle had revealed that he had not been present the afternoon of the alleged conspiracy and in fact had never been offered a reward for the killings. (Tr. at 486-88). However, because Mr. Pringle was concerned about criminal liability arising from his involvement in Mr. Rosario's narcotics operation, he refused to answer any of the defense's questions. (Tr. at 487-93) Instead, Mr. Pringle asserted his Fifth Amendment privilege against self-incrimination. (Tr. at 484-85, 492-93). As a result he was never called by the defense to testify before the jury.

On November 15, 1995, the jury convicted Mr. Rosario on all charges. (Tr. at 838-41). He was sentenced to an indeterminate term of imprisonment from thirty-eight and one-third years to life. (Tr. at 862).

D. Post-Trial Proceedings

On July 19, 1999, the petitioner moved pro se to vacate the

judgment of conviction pursuant to New York Criminal Procedure Law ("CPL") § 440.10, alleging that (1) the prosecution had violated Brady by failing to disclose alibi witnesses, (2) the prosecution had improperly introduced the eye witness testimony of Milton Harris, knowing it to be false, and (3) the petitioner's defense counsel was ineffective for failing to subpoena alibi witnesses. (Motion to Vacate Judgment Pursuant to C.P.L. 440.10 ("First § 440.10 Motion"), attached as Exh. 6 to Affidavit of Kayonia L. Whetstone dated Feb. 14, 2008 ("Whetstone Aff.")). On December 23, 1999, the court denied the petitioner's motion in all respects. (Decision and Order dated Dec. 23, 1999 ("First § 440.10 Decision"), attached as Exh. 8 to Whetstone Aff., at 7).

The petitioner sought leave to appeal the denial of his motion to vacate and moved to consolidate that appeal with his pending direct appeal. On March 16, 2000, the Appellate Division, First Department, granted the petitioner's application in both respects. In his consolidated appeal, the petitioner argued that (1) the prosecution's failure to turn over Nicholas Taylor's statements to the police constituted a Brady violation in that it had deprived the petitioner of the opportunity to use the statements effectively at trial, (2) the trial court had erred in admitting evidence that the gun used in this case had been used in a prior shooting, (3) the trial court had erred in admitting evidence regarding threats that the petitioner had allegedly made to intimidate Mr. Harris,

12

(4) the petitioner's trial counsel had been ineffective for failing to call alibi witnesses, and (5) the petitioner's conviction was based on insufficient evidence. (Brief for Defendant-Appellant, attached as Exh. 9 to Whetstone Aff., at ii-iii).

On October 7, 2003, the Appellate Division affirmed the conviction. Relying on its earlier ruling in People v. Jackson, 264 A.D.2d 683, 695 N.Y.S.2d 357 (1st Dep't 1999), the court held that the trial court had properly resolved the Brady issue. People v. Rosario, 309 A.D.2d 537, 537, 765 N.Y.S.2d 320, 320 (1st Dep't 2003). In Jackson, the Appellate Division had reviewed that issue in the context of the appeal by Cory Jackson, Mr. Rosario's co-defendant at the time of the Brady hearing. The court found that although the prosecution had violated its disclosure obligations under Brady, "the extraordinary sanction of dismissal was not warranted," and "any prejudice to the defendant from the resulting delay was prevented by the court's curative actions." Jackson, 264 A.D.2d at 683-84, 695 N.Y.S.2d at 358. The Appellate Division also rejected Mr. Rosario's other claims, ruling that evidence regarding the prior use of the murder weapon was "not unduly prejudicial," that the "court had properly admitted evidence . . . that the defendant had made an implied threat to harm the People's main witness," that Mr. Rosario had "received effective assistance of counsel . . . [as there were] reasonable strategic explanations for trial counsel's decision not to call certain witnesses," and that

the verdict was "based on legally sufficient evidence." Rosario, 309 A.D.2d at 537-38, 765 N.Y.S.2d at 320-21.  Thereafter, the New York Court of Appeals denied leave to appeal.  People v. Rosario, 1 N.Y.3d 579, 775 N.Y.S.2d 795 (2003).

On December 21, 2004, the petitioner filed an application for a writ of error coram nobis seeking to set aside the verdict on grounds of ineffective assistance of appellate counsel. (Application for Writ of Error Coram Nobis, attached as Exh. 13 to Whetstone Aff.).  Mr. Rosario alleged that his appellate counsel had been ineffective for failing to pursue a claim that he had been denied due process when the trial judge had permitted Josh Pringle to assert his Fifth Amendment privilege against self-incrimination, in refusing to testify on Mr. Rosario's behalf.  On December 22, 2005, the Appellate Division denied the petitioner's motion. People v. Rosario, 2005 N.Y. App. Div. LEXIS 14745 (1st Dep't Dec. 22, 2005).  The New York Court of Appeals denied the petitioner's application for leave to appeal.  People v. Rosario, 6 N.Y.3d 817, 812 N.Y.S.2d 457 (2006).

On April 20, 2006, the petitioner, now represented by attorney Barry M. Fallick, filed a second motion to vacate the judgment of his conviction.  (Motion to Vacate Judgment Pursuant to CPL § 440.10 dated April 20, 2006 ("Second § 440.10 Motion"), attached as Exh. 15 to Whetstone Aff.).  In support of the motion, the petitioner submitted sworn statements obtained from Nicholas

14

Taylor, transcriptions of interviews of Mr. Taylor taken by Mr. Fallick's investigators, and notes written by the investigators that sum up the relevant conversations with Mr. Taylor. According to Mr. Fallick, these demonstrated that the prosecution had improperly intimidated Mr. Taylor in an effort to prevent him from testifying. (Second § 440.10 Motion at 11-22).

In a document entitled "Synopsis," which summarized one of the interviews conducted with Nicholas Taylor, the investigator stated that Mr. Taylor remembered the incident and "in fact 're-lives' it almost every day." (Synopsis, attached to Second § 440.10 Motion and as Exh. A to Petition for a Writ of Habeas Corpus ("Habeas Pet."), ¶ 6). In a sworn statement to defense investigators dated May 3, 2005, Mr. Taylor stated that he was told to implicate Cory Jackson in the shooting because if he did not, "there would be a $50,000 contract," offered for his own murder. (Statement of Nicholas Taylor dated May 3, 2005 ("Taylor 5/3/05 Statement"), attached to Second § 440.10 Motion and as Exh. A to Habeas Pet., at 1). In the statement, Mr. Taylor said that he was unsure whether an assistant district attorney or a detective was responsible for the threats but described the man making the threats as "clean cut, tall [and], wearing a suit." (Taylor 5/3/05 Statement at 1). In another statement, Mr. Taylor specifically said that a "Detective Slaughter" (presumably referring to the detective who interviewed him) had mentioned the $50,000 contract, and went on to state that

"[o]ne of the D.A.'s told me if I did not tell what they wanted to hear that someone was going to get me on the streets for this." (Statement of Nicholas Taylor, attached to Letter of Barry M. Fallick dated Sept. 1, 2006, attached as Exh. 18 to Whetstone Aff.).

On December 5, 2006, the court denied Mr. Rosario's second § 440.10 motion in its entirety. (Decision and Order dated Dec. 23, 2006 ("Second § 440.10 Decision"), attached as Exh. 20 to Whetstone Aff.). The court found that the claim that Taylor had fabricated his memory loss at the hearing was "unworthy of belief." (Second § 440.10 Decision at 7). In the court's analysis, "Taylor's new statements are inherently unreliable since they contain errors and are inconsistent with his prior accounts of the incident." (Second § 440.10 Decision at 9).

On May 7, 2007, the petitioner, still represented by Mr. Fallick, filed the instant petition. Since then, Mr. Fallick has passed away and Mr. Rosario is again proceeding pro se.

Discussion[5]

---

[5] Prior to passage of the Antiterrorism and Effective Death Penalty Act (the "AEDPA"), factual findings made by a state court after an evidentiary hearing were presumed correct in a federal habeas proceeding, however, federal courts were not required to defer to state court determinations of law and of mixed questions of law and fact. See Thompson v. Keohane, 516 U.S. 99, 107-12 (1995); Brown v. Artuz, 283 F.3d 492, 497 (2d Cir. 2002). Under the AEDPA, however, a writ of habeas corpus may not issue "with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the

A. Intimidation of Nicholas Taylor

The petitioner claims that Nicholas Taylor was improperly prevented from testifying at trial because he was intimidated either by police officers or by one of the assistant district attorneys. To support his claims, Mr. Rosario has submitted the interviews and statements of Nicholas Taylor obtained by Mr. Fallick's investigators. He previously submitted these in support of his second § 440.10 motion. In response to that motion, the state court found that Mr. Taylor's claims of intimidation were unreliable and that "the record amply demonstrates that Taylor's impairment and inability to recall the incident was the reason he was not called to testify." (Second § 440.10 Decision at 7).

A state court's holding on a factual issue is entitled to a presumption of correctness:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

United States."  28 U.S.C. § 2254(d)(1).

The AEDPA standard applies to this case since Mr. Rosario filed his petition after the Act's effective date. See Brown, 283 F.3d at 498 n.2. However, where, as here, the petitioner's claims fail under the less deferential pre-AEDPA standard, there is no need to conduct the AEDPA's more intricate analysis. See Kruelski v. Connecticut Superior Court for the Judicial District of Danbury, 316 F.3d 103, 106 (2d Cir. 2003) (suggesting, in post-AEDPA cases, that habeas courts should assess first whether state court's ruling was erroneous under the "correct interpretation" of federal law at issue, then whether the ruling was unreasonable).

28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Morris v. Reynolds</u>, 264 F.3d 38,
47 (2d Cir. 2001); <u>Leslie v. Artuz</u>, 230 F.3d 25, 31 (2d Cir. 2000).
In the context of federal habeas review, a state court's "decision
adjudicated on the merits . . . and based on a factual
determination will not be overturned on factual grounds unless
objectively unreasonable in light of evidence presented in the
state-court proceeding." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340
(2003).   A petitioner can overcome the state court's factual
determination only if it is not fairly supported by the record or
not adequately developed at the state court hearing.   <u>Morris</u>, 264
F.3d at 47.   If the petitioner has satisfied this burden "[a]
federal court can disagree with a state court's . . . determination
and, when guided by the AEDPA, conclude the decision was
unreasonable or that the factual premise was incorrect by clear and
convincing evidence." <u>Miller-El</u>, 537 U.S. at 340.

    The petitioner has not satisfied his burden.  It is clear from
the record that Nicholas Taylor suffered from a genuine cognitive
disability.   The stenographically recorded statement made to
Assistant District Attorney Tony Castro is fairly characterized as
muddled: Mr. Taylor had trouble answering his interrogator's
questions directly and expressing a coherent time line of events.
Detective Slattery, who took down Mr. Taylor's first statement,
testified that during the interview, it was apparent that Mr.
Taylor's level of intelligence was years below his actual age.  (H.

18

at 466). In fact, at the <u>Brady</u> hearing, both parties agreed that Mr. Taylor, then sixteen, possessed an intelligence level equivalent to that of a ten-year-old. (H. at 334).

The record also demonstrates that Mr. Taylor's perceptions were prone to distortion. At one point, after meeting with defense counsel, Mr. Taylor was apparently convinced that he was "going to jail because he [did not] remember," the events surrounding the shooting. (H. at 394). Apparently, Mr. Taylor had misconstrued the conversation to arrive at this conclusion. (H. at 394).

Ultimately, Mr. Taylor himself confirmed that his memory loss was the result of his cognitive deficiencies and not intimidation by the police or prosecution. In a sworn questionnaire prepared by the petitioner's defense investigators, Mr. Taylor responded as follows:

> Q: While on the stand, did someone tried (sic) to get you not to remember the accounts of the shooting?
>
> A: No, it was at a time when it was hard for me to remember things.

(Second § 440.10 Motion, unnumbered page 19). By Mr. Taylor's own admission, his trouble in recalling the events on the stand were due to naturally occurring memory loss. Because the petitioner has not demonstrated by clear and convincing evidence that this memory loss resulted from intimidation, he has not satisfied his burden of rebutting the state court's finding of fact. As a result, the petitioner's claim of prosecutorial misconduct must fail.

19

B. <u>The Brady Claim</u>

1. <u>Late Disclosure of Nicholas Taylor's Statements</u>

Mr. Rosario contends that the introduction of Nicholas Taylor's statements at trial, together with the adverse inference charge, was insufficient to cure the prejudice that resulted from the late disclosure of the statements to the defense. He argues that had the statements been timely disclosed, the defense would have been afforded the opportunity to question Mr. Taylor while his memory was still intact. In addition, because Mr. Taylor's memory loss rendered him unusable as a witness, the petitioner argues he was deprived of the right to call Mr. Taylor to the stand to discredit Mr. Harris' testimony. At the <u>Brady</u> hearing, defense counsel also argued that had they received the statements earlier they could have repeatedly refreshed Mr. Taylor's memory by reading him the statements he had made to the police. (H. at 385-86). Accordingly, the petitioner contends the only remedy that would have adequately cured the prejudice that resulted from the <u>Brady</u> violation was dismissal.

The Second Circuit has summarized the prosecution's duty under <u>Brady</u> as follows: "to the extent that a prosecutor knows of material evidence favorable to the defendant in a criminal prosecution, the government has a due process obligation grounded in the 14th Amendment to disclose that evidence to the defendant." <u>DiSimone v. Phillips</u>, 461 F.3d 181, 192 (2d Cir. 2006) (quoting <u>Leka v. Portuondo</u>, 257 F.3d 89, 98 (2d Cir. 2001)). Thus, there

20

are three components to a <u>Brady</u> violation: "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999). Favorable evidence is only material where there is a "reasonable probability" that the outcome of the case would have been different had the evidence been disclosed. <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985). A "reasonable probability" in this context arises "when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" <u>Kyles v. Whitley</u>, 514 U.S. 419, 434 (1995) (quoting <u>Bagley</u>, 473 U.S. at 678). The question that a habeas corpus court must consider, then, is whether, without the evidence, the petitioner still received a fair trial. <u>See</u> <u>id.</u> For example, "[w]hen the 'reliability of a given witness may well be determinative of guilt or innocence,' nondisclosure of evidence affecting credibility falls within this general rule." <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972) (quoting <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959)).

By contrast, "additional evidence tending to further impeach the credibility of a witness whose character ha[s] already shown to be questionable," is cumulative and generally not material. <u>United States v. Petrillo</u>, 821 F.2d 85, 89-90 (2d Cir. 1987) (quoting <u>United States v. Rosner</u>, 516 F.2d 269, 273-74 (2d Cir. 1975)). Nor is evidence considered "suppressed" if the defendant "either

knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence." <u>Leka</u>, 257 F.3d at 100 (quoting <u>United States v. Leroy</u>, 687 F.2d 610, 618 (2d Cir. 1982)); <u>see also</u> <u>United States v. Torres</u>, 129 F.3d 710, 717 (2d Cir. 1997). If favorable information is not disclosed "in sufficient time to afford the defense an opportunity for use" it is considered suppressed for the purposes of <u>Brady</u>. <u>DiSimone</u>, 461 F.3d at 196 (quoting <u>Leka</u>, 257 F.3d at 103). A sufficient time is that which gives the defense a satisfactory opportunity to consider the material and to permit its "effective use at trial." <u>United States v. Gil</u>, 297 F.3d 93, 105 (2d Cir. 2002) (quoting <u>In re United States (Coppa)</u>, 267 F.3d 132, 142 (2d Cir. 2001)).

While it is clear that Mr. Taylor's statements constitute <u>Brady</u> material in that they contradict some of Mr. Harris' testimony and undermine his credibility, it is questionable whether the prosecution's late disclosure of the materials resulted in prejudice that is cognizable under <u>Brady</u>. To begin with, the statements were disclosed a full six weeks prior to trial. Thus the defense was given ample time to incorporate the statements (in the absence of Mr. Taylor's actual testimony) into the presentation of its case. In addition, the defense engaged in a vigorous cross-examination of Mr. Harris, bringing to light numerous inconsistencies between his earlier statements to the police and the grand jury and his testimony on direct examination. The

defense further undermined Mr. Harris' credibility by revealing that he had originally been a suspect in the shootings. Thus, the jury was fairly presented with reasons to question Mr. Harris' credibility as a witness as well as his motivation for testifying. Furthermore, although Mr. Taylor's statements contradicted Mr. Harris in several respects, they did not contradict the essential aspects of his testimony: that he had been present at a meeting in which the petitioner had offered a reward for the life of Otis Lamont Blair, that Cory Jackson had indicated a willingness to do the deed, and that Mr. Jackson had subsequently admitted to getting paid for doing so. Mr. Taylor's statements, though impeaching, were therefore merely additional evidence tending to undercut further the credibility of Mr. Harris's testimony for reasons already before the jury. Accordingly, it is doubtful that the suppression of Mr. Taylor's statements, even absent the trial court's remedial measures, would undermine confidence in the outcome of the trial.

### 2. The Trial Court's Remedial Measures

In any event, the remedial measures imposed by the trial court cured any prejudice the petitioner may have experienced as a result of the late disclosure. The central concern of the Brady analysis is to ensure that the defendant has received a fair trial. See Strickler, 527 U.S. at 264; Kyles, 514 U.S. at 433. In general, remedies should be tailored to the injury suffered from the

constitutional violation and should not unnecessarily infringe on competing interests." United States v. Morrison, 449 U.S. 361, 364 (1981)(discussing the scope of remedial measures in the context of 4th, 5th, and 6th Amendment violations).   Appropriate measures will "identify and then neutralize the taint by tailoring relief appropriate in the circumstance . . . ." Id. at 365.   The Second Circuit has adopted a pragmatic balancing approach where the court considers "the government's culpability for the loss [of the evidence], together with a realistic appraisal of its significance when viewed in light of its nature, its bearing upon critical issues in the case and the strength of the government's untainted proof." United States v. Grammatikos, 633 F.2d 1013, 1020 (2d Cir. 1980); accord United States v. Dalisay, No. 03 Cr. 1305, 2005 WL 1176115, at *7 (S.D.N.Y. May 17, 2005); see also United States v. Miranda, 526 F.2d 1319, 1324-25 (2d Cir. 1975).   Ultimately, however, the key inquiry is still whether the defendant received a fair trial, or whether there is a "reasonable probability that had the evidence been disclosed, the result of the trial would have been different." Kowalczyk v. United States, 930 F. Supp. 1127, 1145-46 (S.D.N.Y. 1996) (quoting Bagley, 473 U.S. at 682); see also Kyles, 514 U.S. at 434.

There is ample evidence in the record that Nicholas Taylor's mental impairment resulted in the loss of his memory.   During his interviews, both Detective Slattery and Assistant District Attorney

Castro noticed Mr. Taylor's comprehension difficulties.  It does not follow, however, that the knowledge of Nicholas Taylor's condition alerted the prosecution to the effect it would have on Mr. Taylor's future recollection.  Thus, the prosecutions's culpability for Mr. Taylor's memory loss is slight.  While it is conceivable that, as the defense argued at the <u>Brady</u> hearing, Mr. Taylor's memory could have been repeatedly "refreshed," his testimony would then have been inherently suspect since it would have been susceptible to coaching and manipulation, a fact the prosecution could have easily brought to light during cross-examination.  Issues regarding Mr. Taylor's credibility were avoided by the admission of his statements together with the adverse inference charge favorable to the defendant.

In sum, Mr. Taylor's testimony was inherently weak due to the effects of his disability and the prosecution's culpability for its loss was at most negligent.  In addition, Mr. Harris's credibility had been thoroughly tested on cross-examination and Mr. Taylor's statements, though impeaching, did not contradict the essential elements of his testimony.  Therefore, even if Mr. Taylor had actually been able to testify at trial, there is no reasonable probability that the jury would have reached a different outcome. <u>See Bagley</u>, 473 U.S. at 482.

C.  <u>Ineffective Assistance of Counsel</u>

Finally, the petitioner claims that he was denied his Sixth

25

Amendment right to effective assistance of counsel because his attorney did not obtain the testimony of several potentially exculpatory witnesses.  Mr. Rosario contends that Brenda and Terell Blair would have testified that Cory Jackson received the gun used in the homicides from Otis Jones, and not, as Milton Harris had testified, from Mr. Rosario himself.  Mr. Rosario also claims that Yolanda Taylor, Nicholas Taylor's sister and Milton Harris' girlfriend at the time of the homicides, would have testified that Mr. Harris had confessed to her that he was responsible for the homicides and that Mr. Rosario was not involved.

A habeas petitioner's claim that he received ineffective assistance of counsel is analyzed according to the principles set forth in Strickland v. Washington, 466 U.S. 668 (1984).  Under this test, a petitioner must demonstrate (1) that the representation he received "fell below an objective standard of reasonableness," id. at 688, and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  When reviewing counsel's performance, a habeas court should be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  Id. at 689.  The habeas court should not "second-guess trial counsel's defense strategy simply because the chosen strategy has failed."  United States v. DiTommaso, 817 F.2d 201, 216 (2d Cir. 1987).  "The

26

decision not to call a particular witness is typically a question of trial strategy," and thus falls within the broad range of acceptable tactical decisions. <u>United States v. Luciano</u>, 158 F.3d 655, 660 (2d Cir 1998). Conclusary and speculative allegations as to the testimony of uncalled witnesses are insufficient to show ineffective assistance of counsel. <u>Muhammad v. Bennett</u>, No. 96 Civ. 8430, 1998 WL 214884, at *1 (S.D.N.Y. April 29, 1998).

Because the petitioner has failed to establish that his trial counsel's performance fell below an objective standard of reasonableness, his claim fails to satisfy the first prong of the <u>Strickland</u> test. Mr. Rosario's attorney stated during the sentencing hearing that in the course of his preparation, he had spoken to Terell and Brenda Blair, "but they refused to testify in court . . . because they were annoyed and irate that no one from the organization would help Turrel Blare [sic] on his federal case." (H. at 854-55). As discussed above, Mr. Harris' credibility was challenged thoroughly on the stand, and thus the decision not to call two reluctant and irate witnesses who were potentially hostile to the petitioner falls within the broad range of tactical decisions entitled to deference.

At the sentencing hearing, Mr. Rosario's trial counsel also stated that Yolanda Taylor had informed him that "Milton Harris admitted to her he was involved in the case, that he committed the homicide, and that Pedro Rosario had nothing to do with it." (H.

27

at 855). However, this is the only reference in the entire record of the potential testimony that Ms. Taylor might provide. Despite the fact that the petitioner's defense investigators spoke with Ms. Taylor while preparing for his second § 440.10 motion, no affidavit or other documentation detailing her potential testimony has been submitted to this Court. Without something from Ms. Taylor summarizing the substance of her testimony, the petitioner has not satisfied his burden of demonstrating that his counsel was obligated to call her as a witness. Because the petitioner has not established that his attorney's performance fell below an objective standard of reasonableness, his claim does not satisfy the first prong of the <u>Strickland</u> test and therefore must fail.

<u>Conclusion</u>

For the reasons set forth above, I recommend that Mr. Rosario's petition for a writ of habeas corpus be denied. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley, Room 2210, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated:    New York, New York
          July 29, 2008

Copies mailed this date to:

Pedro Rosario
94-A-2927
Shawangunk Correctional Facility
Wallkill, New York 12589

Kayonia Whetstone, Esq.
Karen Swiger, Esq.
Assistant District Attorney
198 East 161st Street
Bronx, New York 10451

29